**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**TRENTON VICINAGE**

_____

| | | |
|---|---|---|
| **Betty Ellen Crumidy, Guardian of** | : | |
| **Milan Dartanian Hoagland, Incapacitated Person** | : | |
| | : | |
| **Plaintiff** | : | |
| **v.** | : | |
| | : | |
| **Robyn Wramage-Caporoso, CEO** | : | CIVIL ACTION NO.: |
| | : | |
| and | : | |
| | : | |
| **James Hollen, Deputy CEO** | : | |
| | : | |
| and | : | |
| | : | |
| **Faith Johnson, Deputy CEO** | : | JURY TRIAL DEMANDED |
| | : | |
| and | : | |
| | : | |
| **Timothy Loesch, Coordinator** | : | |
| | : | |
| and | : | |
| | : | |
| **Intikhab Ahmad, MD** | : | |
| | : | |
| and | : | |
| | : | |
| **Faiza Zubair, DO** | : | |
| | : | |
| and | : | |
| | : | |
| **Metty Clark, RN** | : | |
| | : | |
| and | : | |
| | : | |
| **Edith Masaquoi, HST** | : | |
| | : | |
| and | : | |

1

**Loveday Anyanwu, HST**                      :
                                             :
    and                  :
                                             :
**Love Aboagye, CN**                         :
                                             :
    and                  :
                                             :
**Sheila Christophe, HST**                   :
                                             :
    and                  :
                                             :
**Tanysha Fryar, HSA**                       :
                                             :
    and                  :
                                             :
**Inesia Bastien, HST**                      :
                                             :
    and                  :
                                             :
**Zachary Walton, CN**                       :
                                             :
    and                  :
                                             :
**Abiola Badejo, SON**                       :     **Jury Trial Demanded**
                                             :
    and                  :
                                             :
**Demetrius Mose, HST**                      :
                                             :
    and                  :
                                             :
**Junior Appolon, RLS**                      :
                                             :
    and                  :
                                             :
**Veronica Arkuwollie, HST**                 :
                                             :
    and                  :
                                             :
**Martine Domond, HST**                      :
                                             :
    and                  :
                                             :

2

**Carmena Jeannot, HSA**                                          :
                                                                 :
    and                                      :
                                                                 :
**Kalu Uguru, CN**                                               :
                                                                 :
    and                                      :
                                                                 :
**Lauretta Ketter, HSA**                                         :
                                                                 :
    and                                      :
                                                                 :
**Ngozi Ochiora, CN**                                            :
                                                                 :
    and                                      :
                                                                 :
**Vida Addai, SON**                                              :
                                                                 :
    and                                      :
                                                                 :
**Keshia Smith, CN**                                             :
                                                                 :
    and                                      :
                                                                 :
**Takay Foka, HSA**                                              :
                                                                 :
    and                                      :
                                                                 :
**Juan Bermudez, Staff Nurse**                                   :
                                                                 :
    and                                      :
                                                                 :
**Marcia Kaplan, ADON**                                          :
                                                                 :
    and                                      :
                                                                 :
**Millicent Anigbogu, ADON**                                     :
                                                                 :
    and                                      :
                                                                 :
**Obunike Edokwe, MD**                                           :
                                                                 :
    and                                      :
                                                                 :

| | |
|---|---|
| **John and/or Jane Does (1-10)** | : |
| **Medical Providers** | : |
| | : |
| **and** | : |
| | : |
| **John and/or Jane Does (1- 10)** | : |
| **Emergency Responders** | : |
| | : |
| **and** | : |
| | : |
| **John and/or Jane Does (1 - 10)** | : |
| **Supervisory Officials** | : |
| | : |
| **Defendants** | : |

---

## CIVIL ACTION - COMPLAINT

### THE PARTIES

1.      Plaintiff, Betty Ellen Crumidy, is an adult individual residing at 247 Hollywood Drive, Hamilton, NJ 08609.

2.      On October 7, 2021, Plaintiff was granted Letters of Guardianship by the Mercer County Surrogate's Court to act as the Guardian of the person of Milan Dartanian Hoagland ("Hoagland"), her cousin who was adjudicated to be an incapacitated person by the Superior Court of New Jersey, Mercer County Chancery Division, on September 23, 2021.

3.      Hoagland is 56 years old (DOB 10/3/66) and currently resides, involuntarily, at Trenton Psychiatric Hospital ("TPH"), a New Jersey psychiatric hospital operated by the Department of Human Services, located at 101 Sullivan Way, Trenton, NJ 08628.

4.      Defendant Robyn Wramage-Caporoso ("CEO Caporoso") was, at all relevant times, the Chief Executive Officer at TPH, acting under the color of law and within the course and scope of her employment and/or agency with the State of New Jersey.

4

5.      Defendant James Hollen ("DCEO Hollen") was, at all relevant times, the Deputy Chief Executive Officer-Operations at TPH, acting under the color of law and within the course and scope of his employment and/or agency with the State of New Jersey.

6.      Defendant Faith Johnson ("DCEO Johnson") was, at all relevant times, the Deputy Chief Executive Officer-Clinical Services at TPH, acting under the color of law and within the course and scope of her employment and/or agency with the State of New Jersey.

7.      Defendant Timothy Loesch ("Coordinator Loesch") was, at all relevant times, the Raycroft Complex Administrator at TPH, acting under the color of law and within the course and scope of his employment and/or agency with the State of New Jersey.

8.      Defendant Intikhab Ahmad, M.D. ("Dr. Ahmad") was, at all relevant times, the Clinical Director at TPH, acting under the color of law and within the course and scope of his employment and/or agency with the State of New Jersey.

9.      Defendant Faiza Zubair, D.O. ("Dr. Zubair") was, at all relevant times, a clinical psychiatrist at TPH, acting under the color of law and within the course and scope of her employment and/or agency with the State of New Jersey.

10.      Defendant Metty Clark, RN ("Nurse Clarke") was, at all relevant times, a Registered Nurse at TPH, acting under the color of law and within the course and scope of her employment and/or agency with the State of New Jersey.

11.      Defendant Edith Masaquoi ("HST Masaquoi") was, at all relevant times, a Human Service Technician ("HST") at TPH, acting under the color of law and within the course and scope of her employment and/or agency with the State of New Jersey.

12.     Defendant Loveday Anyanwu ("HST Anyanwu") was, at all relevant times, a HST at TPH, acting under the color of law and within the course and scope of his employment and/or agency with the State of New Jersey.

13.     Defendant Love Aboagye ("Nurse Aboagye") was, at all relevant times, a Charge Nurse ("CN") at TPH, acting under the color of law and within the course and scope of her employment and/or agency with the State of New Jersey.

14.     Defendant Sheila Christophe ("HST Christophe") was, at all relevant times, a HST at TPH, acting under the color of law and within the course and scope of her employment and/or agency with the State of New Jersey.

15.     Defendant Tanysha Fryar ("HSA Fryar") was, at all relevant times, a Human Services Assistant ("HSA") at TPH, acting under the color of law and within the course and scope of her employment and/or agency with the State of New Jersey.

16.     Defendant Inesia Bastien ("HST Bastien") was, at all relevant times, a HST at TPH, acting under the color of law and within the course and scope of her employment and/or agency with the State of New Jersey.

17.     Defendant Zachary Walton ("Nurse Walton") was, at all relevant times, a CN at TPH, acting under the color of law and within the course and scope of his employment and/or agency with the State of New Jersey.

18.     Defendant Abiola Badejo ("SON Badejo") was, at all relevant times, a Supervisor of Nursing ("SON") at TPH, acting under the color of law and within the course and scope of her employment and/or agency with the State of New Jersey.

19.    Defendant Demetrius Mose ("HST Mose") was, at all relevant times, a HST at TPH, acting under the color of law and within the course and scope of his employment and/or agency with the State of New Jersey.

20.    Defendant Junior Appolon ("RLS Appolon") was, at all relevant times, a Residential Living Specialist ("RLS") with the Special Instructors Services Unit ("SISU") at TPH, acting under the color of law and within the course and scope of his employment and/or agency with the State of New Jersey.

21.    Defendant Veronica Arkuwollie ("HST Arkuwollie") was, at all relevant times, a HST at TPH, acting under the color of law and within the course and scope of her employment and/or agency with the State of New Jersey.

22.    Defendant Martine Domond ("HST Domond") was, at all relevant times, a HST at TPH, acting under the color of law and within the course and scope of her employment and/or agency with the State of New Jersey.

23.    Defendant Carmena Jeannot ("HSA Jeannot") was, at all relevant times, a HSA at TPH, acting under the color of law and within the course and scope of her employment and/or agency with the State of New Jersey.

24.    Defendant Kalu Uguru ("Nurse Uguru") was, at all relevant times, a CN at TPH, acting under the color of law and within the course and scope of his employment and/or agency with the State of New Jersey.

25.    Defendant Lauretta Ketter ("HSA Ketter") was, at all relevant times, a HSA at TPH, acting under the color of law and within the course and scope of her employment and/or agency with the State of New Jersey.

26.     Defendant Ngozi Ochiora ("Nurse Ochiora") was, at all relevant times, a CN at TPH, acting under the color of law and within the course and scope of her employment and/or agency with the State of New Jersey.

27.     Defendant Vida Addai ("SON Addei") was, at all relevant times, a SON at TPH, acting under the color of law and within the course and scope of her employment and/or agency with the State of New Jersey.

28.     Defendant Keshia Smith ("Nurse Smith") was, at all relevant times, a CN at TPH, acting under the color of law and within the course and scope of her employment and/or agency with the State of New Jersey.

29.     Defendant Takay Foka ("HSA Foka") was, at all relevant times, a HSA at TPH, acting under the color of law and within the course and scope of his employment and/or agency with the State of New Jersey.

30.     Defendant Juan Bermudez ("Nurse Bermudez") was, at all relevant times, a staff nurse at TPH, acting under the color of law and within the course and scope of his employment and/or agency with the State of New Jersey.

31.     Defendant Marcia Kaplan ("ADON Kaplan") was, at all relevant times, an Assistant Director of Nursing ("ADON") at TPH, acting under the color of law and within the course and scope of her employment and/or agency with the State of New Jersey.

32.     Defendant Millicent Anigbogu ("ADON Anigbogu") was, at all relevant times, an Assistant Director of Nursing ("ADON") at TPH, acting under the color of law and within the course and scope of her employment and/or agency with the State of New Jersey.

33.    Defendant Obunike Edokwe, M.D. ("Dr. Edokwe") was at all relevant times a medical doctor specializing in family medicine at TPH, acting under the color of law and within the course and scope of his employment and/or agency with the State of New Jersey.

34.    Defendant Medical Providers John/Jane Does (1-10) are doctors, nurses, or other presently unknown medical providers working at TPH who either provided or should have provided medical care to Hoagland on or before May 4, 2021.

35.    Defendant Emergency Responders John/Jane Does (1-10) are other presently unknown medical and/or security personnel working at TPH on the night of May 4, 2021, who either responded or should have responded to emergency calls involving Hoagland.

36.    Defendant Supervisory Officials John/Jane Does (1-10) are other presently unknown supervisory officials working at TPH with direct or indirect responsibility for the operation, management, policies, procedures, control, and security of TPH at all relevant times.

## JURISDICTION AND VENUE

37.    This Court has jurisdiction of this action over all Defendants pursuant to 42 U.S.C. § 1983 as well as 28 U.S.C. § 1331.    This Court has jurisdiction over the pendant state tort law claims pursuant to 28 U.S.C. § 1367(a).

38.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to Plaintiff's claims took place here and, upon information and belief, multiple Defendants reside here.

## FACTUAL BACKGROUND

39.    Long before Defendants' deliberate indifference, lack of professional judgment, and overall negligence allowed a group of mentally ill patients to savagely beat Hoagland into a

coma in a TPS nursing station on May 4, 2021, Hoagland, along with his precarious tendencies and observational needs, were well known to TPH personnel, including doctors, nurses, HST, HSA, and RLS, all the way up to upper management including the CEO and Deputy CEOs.

40.     Upon information and belief, Hoagland had a history multiple psychiatric hospitalizations throughout his adult life, including at TPH, for diagnoses including schizoaffective disorder, bipolar type, substance use disorder, and antisocial personality disorder.

41.     After being transferred from TPH (where Hoagland had been committed for an unknown but extended period of time) to the Ann Klein Forensic Center in 2019 due to a pattern of assaultive and aggressive behavior, Hoagland was readmitted to TPH on August 3, 2020. His status was involuntary civil commitment.    In 2020 and 2021, longstanding TPH employees CEO Caporoso, DCEO Hollen, and DCEO Johnson continued to hold upper management positions and Dr. Ahmad continued to serve as Clinical Director, overseeing all medical care.

42.     According to TPH records, Hoagland was initially placed in the Drake unit upon reentry from Ann Klein, was moved to the Travers unit at the end of 2020, and then moved again to a locked unit, Raycroft, on or about March 4, 2021, due to medication non-compliance, threatening behavior, and "decompensated mental health."

43.     Hoagland did not adjust well to the Raycroft unit and bounced between sections East-2 (for which David Reznik, MD- "Dr. Reznik" - served as the clinical psychiatrist) and West-2 (Dr. Zubair's patients) due to ongoing aggressive and assaultive behavior, requiring Involuntary Medication Administration Report ("IMAR") status after refusing to take his psychotropic medications.

44.    Upon information and belief, after several more altercations with staff and patient peers, culminating in an altercation with a peer on or about April 2, 2021, Dr. Reznik placed Hoagland on observation status, initially 2:1 and then 1:1.

45.    On April 6, 2021, Dr. Reznik wrote on an IMAR form, co-signed by Coordinator Loesch, that Hoagland "*is not redirectable, at times intrusive, refusing to meet with the clinical team.*" (emphasis added).

46.    Although Hoagland remained a risk to himself and others, Dr. Reznik discontinued observations on April 15th.

47.    On April 22nd, Dr. Reznik again wrote on an IMAR form, *inter alia*: "*He is not redirectable, at times intrusive, refusing to meet with the clinical team.*" (emphasis added)

48.    On or about April 23rd, due to an altercation with peers, the administrative decision was made to transfer Hoagland from Raycroft East-2 to Raycroft West-2.

49.    On April 28th, Dr. Zubair wrote the following note: "*This morning while nurses were moving the medication cart, he became agitated and verbally abusive without provocation and overturned the entire cart.   The medications were thrown about on the floor along with the all patient's information sheets.   Patient then proceeded to threaten to attack the nurse and male staff intervened.   When seen, patient was psychotic, delusional, hyperverbal, threatening and aggressive.   He was offered pain medications twice of 2 different kinds but he refused so IM medications were given, and a physical hold was required.*" (emphasis added)

50.    That same day, Nurse Clarke, the day Charge Nurse for Raycroft West-2, wrote a similar note, stating that "counseling and redirection ineffective" and that Dr. Ahmad was notified. Nurse Aboagye, the night Charge Nurse for Raycroft West-2, also noted the incident.

51.     On April 29th, Dr. Ahmad signed a Psychotropic Emergency Medication Certification Form certifying that emergency medication was appropriately administered.   At the time, Hoagland was administered medications including Prolixin and Haldol.

52.     On April 29 and April 30, Nurse Clarke and Nurse Aboagye both noted (a) risk for aggression; (b) coping skills encouraged; (c) unpredictable; and (d) continue plan of care.

53.     While a similar note was written by a different nurse on May 1st, no note was written (per the medical records) for May 2nd.   On May 3rd, the nursing note appears to indicate that Hoagland was seen in the orthopedic clinic for a knee sprain.

54.     According to an incident statement later written by HST Christophe, on May 3rd, Hoagland "*threatened to kill me for taking his phone card last year which I gave to the PC Mr. Tim.   So I informed the Charge Nurse and the Administrator.*" (emphasis added)

55.     On the morning of May 4th, Hoagland was evaluated by Dr. Zubair as part of a 30-day plan, at which time she noted Hoagland to be delusional, bizarre, disorganized, loud, verbally aggressive, and violent.   Dr. Zubair, along with Nurse Clarke and others, signed an IMAR form indicating that Hoagland remained aggressive and was to remain on IMAR.

56.     According to an incident statement later written by Nurse Aboagye, "Hoagland was threatening [me] at the beginning of the shift [3 pm] to the extent that [I] had to pretend reporting [Hoagland's] threat to the camera which made him move away from [me]."

57.     HST Anyanwu also later reported that, during the shift, Hoagland was "threatening other staff and that [Nurse] Aboagye was aware of Mr. Hoagland's behavioral issues"; and HSA Ketter later reported that "during her shift she did observe Mr. Hoagland being verbally and physically abusive towards [patients] and staff, but that was his normal behavior."

58.     According to HST Christophe's aforementioned incident statement, "at 7 pm [Hoagland] attempted to attack me."   She also stated that she "was concerned that they put mostly female staff on the unit with 34 dangerous men."

59.     Despite Hoagland's knowingly threatening and dangerous behavior, no interventions or plan of care changes were implemented, including but not limited to a housing transfer, 1:1 or 2:1 observation (observations which were not implemented at any point in time following Hoagland's transfer to West-2 over ten days prior), or any medication adjustments.

### THE SAVAGE BEATING AND RAMPANT FAILURE TO INTERVENE/RESPOND

60.     Around 9 pm on May 4th, Hoagland became irate and confronted HST Masaquoi in the hallway outside his room, grabbing a paper garbage bag out of her hand and ripping it up.[1]

61.     At that time, HST Masaquoi walked to the Nurses Station, used a key to unlock the door, and entered so that she could report Hoagland's behavior to Nurse Aboagye, who was sitting alone in the Medication Room.   Upon information and belief, Nurse Aboagye simply instructed HST Masaquoi to stay in the Nurses Station until Hoagland returned to his room.

62.     While HST Masaquoi was standing in the Nurses Station, HST Anyanwu walked onto the hallway and approached the Nurses Station.   At that time, which was approximately one minute after Hoagland ripped up the garbage bag, Hoagland rumbled down the hallway past the door to the Nurses Station where HST Anyanwu was standing with his key in hand, about to

---

[1] Many of the events described herein were captured on surveillance video taken from two cameras on Raycroft West-2, one reflecting a long hallway in front of the Nurses Station and the other reflecting the Medication Room accessed through the right rear of the Nurse's Station.   While this video footage was produced by TPH during pre-Complaint discovery, the Department of Health ("DOH") Investigation Report (hereinafter "DOH Report") discusses surveillance video from two other cameras, the footage for which was not produced despite Plaintiff's repeated requests for same.

open the door.    Clearly agitated, Hoagland grabbed two garbage bags full of trash, and threw them all over the floor in front of the Nurses Station, directly where HST Anyanwu was standing.

63.    As HST Anyanwu opened the door to the Nurses Station, Hoagland scampered over and swung his arms several times in HST Anyanwu's direction, following him into the Nurses Station.

64.    HST Anyanwu immediately retreated into the Medication Room, with blood on his face (purportedly from a pen in Hoagland's punching hand), at which time Nurse Aboagye immediately closed the door, leaving HST Masaquoi alone in the Nurses Station with an enraged Hoagland, who was throwing around everything in sight for the next minute (one or more items of which struck HST Masaquoi's face).

65.    Seconds after closing the Medication Room door (around 9:01 pm), Nurse Aboagye pressed a red button on the Medication Room wall, activating a psychiatric emergency code, and also repeatedly attempted to call in the emergency via a wall phone (which purportedly was not working).    At no time did Nurse Aboagye use her cell phone (in plain view on the Medication Room desk) to place an emergency call.

66.    For the next minute or two, Nurse Aboagye and HST Anyanwu took turns holding the door shut, while peering through the door's window and observing firsthand the chaos unfolding in the Nurses Station.    According to HST Masaquoi, she "began to bang on the door yelling and screaming for help saying, '**Please help me, he is going to kill me**' [but] staff refused to open the door or offer any form of assistance.'"

14

67.     As Nurse Aboagye and HST Anyanwu hid in the Medication Room, patients on the unit realized what was transpiring and stood in the hallway, frantically banging on the windows to the Nurses Station.

68.     Approximately one minute after Nurse Aboagye pressed the emergency button, HST Christophe responded to the scene.   However, she merely unlocked the Nurses Station door and pushed it open, foreseeably enabling the patients to rush in and attack Hoagland, without ever instructing them not to do so.

69.     In particular, four patients (with the initials HA, MM, MT, and BR) repeatedly punched and kicked Hoagland and struck him with foreign objects in the Nurses Station.[2]   HST Christophe never entered the Nurses Station or took any action to stop the gang beating – she just stood there and watched for ten seconds before walking back down the hallway.

70.     As HST Christophe was walking away, HST Masaquoi exited the Nurses Station, also without taking any action to stop the gang beating.

71.     At that time, HSA Fryar and HST Bastien arrived on the hallway in response to the psychiatric emergency code, but they as well never entered the Nurses Station or took any action to stop the gang beating and intervene on behalf of an outnumbered and defenseless patient.[3]

---

[2] Upon information and belief, although friction between Hoagland and HA was ongoing and well known to TPH staff, they were not separated and instead housed in the very same unit – Raycroft West-2.

[3] According to the investigative materials, HST Bastien had just begun her break at 9pm from her shift on West-2. HSA Foka had also just begun his break on West-2 but chose to stay on break instead of responding to the code. HSA Ketter was returning to her West-2 shift from break (which ended at 9 pm) but, rather than reporting directly to the Nurses Station, she stopped to speak with HST Masaquoi in the second floor lounge situated in the hallway between West-2 and East-2 (per the Report, she is seen on video to be by the lounge from approximately 9:09 to 9:14 pm). Similarly, Nurse Smith (who was working on West-1 at the time) purportedly responded to the code by spending time with HST Masaquoi by the lounge, rather than actually responding to the ongoing emergency.

72.     Finally, approximately thirty seconds later, Nurse Aboagye opened the Medication Room door and entered the rear of the Nurses Station, at which time the patients stopped beating on Hoagland.   Three of the patients (MM, MT, and BR) left the Nurses Station with Nurse Aboagye, leaving only HA inside as Hoagland can be seen convulsing on the floor.

73.      Seconds later, HST Anyanwu walked out of the Medication Room, stepped over Hoagland, and exited the Nurses Station, making no attempt to escort HA out into the hallway, call for help, or tend to Hoagland.

74.     Not a single TPH employee and/or agent called a medical emergency until a few more minutes elapsed (during which the savage beating of Hoagland continued as described below), at which time Nurse Aboagye reportedly used a working telephone in a different room on the hallway to call "111" within TPH.

75.     By now, two minutes after the psychiatric emergency code was activated, Nurse Walton and SON Badejo walked down the hallway and stood in the entrance to the Nurses Station, followed by HST Mose thirty seconds later.

76.     At that time, HA picked up a large water cooler in the Nurses Station and threw it at a helpless Hoagland.   Although seven of the aforementioned staff members were standing right by the doorway (Mose, Walton, Anyanwu, Christophe, Aboagye, Badejo, and Bastien), they allowed HA to scare them away and close the door.

77.     HA then picked up the cooler and bashed Hoagland over the head with it nine times over the course of the next twenty seconds, causing Hoagland further irreparable damage.[4]

---

[4] According to the video, an entire minute passed between when the gang stopped beating on Hoagland to when HA threw the cooler at him, and another twenty seconds before HA started bashing Hoagland over the head with the cooler.

78.     As HA's aggravated assault was continuing, the first and only security staffer to respond, RLS Appolon, started walking down the hallway – three minutes after the psychiatric emergency code was activated.

79.     As RLS Appolon reached the doorway, HST Mose and then SON Badejo fumbled to open the door that they allowed HA to close.    Once the door was opened, RLS Appolon stepped in and was able to intercept HA's tenth strike with the water cooler.    His presence forced HA out of the Nurses Station and into the hallway.

80.     By that time, Nurse Uguru arrived at the scene and, after a minute or so, walked into the Nurses Station where Hoagland had been left alone on the floor, facedown and bleeding. However, Nurse Uguru just stood there and provided no medical care to Hoagland, who was moaning in pain and in desperate need of such.

81.     According to the DOH Report, a medical emergency was not called until 9:06 or 9:07 pm – several minutes **after** Hoagland's critical condition from the gang beating was readily apparent and **after** HA was allowed to inflict more harm and pain via the water cooler.    Among those notified were Dr. Edokwe (who was the "MOD" – Medical Officer of the Day), ADON Kaplan, and ADON Anigbogu.

82.     Other medical emergency calls followed at or about 9:10 pm and 9:12 pm. Around that time, an unknown male staffer (wearing gray pants and what appears to be a black sweatshirt, believed to be Nurse Bermudez)[5]  and unknown female staffer (wearing gray pants

---

[5] Although he worked on West-1, just down one flight of stairs from West-2, he is not seen exiting the stairwell until 10:27 of the video, approximately eight minutes after the code was called.

and a blue shirt with a blue hair covering) arrived at the scene[6], followed shortly thereafter by HSA Gregory Turner ("HSA Turner"), who wheeled a crash cart into the Nurses Station and then proceeded to pick up trash in the hallway.    Also arriving at the scene around this time or minutes later were two more unknown female staffers (one wearing light blue scrubs and pink sneakers and the other, believed to SON Addai, wearing a patterned collar shirt and light pants) and two more unknown male staffers (one wearing gray jeans and a black t-shirt and the other wearing gray pants and a gray short sleeved button-down shirt).[7]

83.    Around 9:15 pm, Nurse Ochiora wheeled another crash cart down the hallway and into the Nurses Station, and a minute later another unidentified female staffer (wearing brown scrubs) showed up but simply stood outside in the hallway.[8]

84.    Despite the presence of two crash carts, as well as other machinery in the Medication Room such as a blood pressure monitor (which Nurse Aboagye later retrieved but, upon information and belief, never used), it appears that no responders utilized any medical equipment available to them.

85.    Around 9:18 pm, over ten minutes from when he was first notified and after having exhausted four minutes to first evaluate the non-life threatening injuries of HST Masaquoi and then HA, Dr. Edokwe finally walked down the hallway and entered the Nurses Station.

---

[6] She is seen walking down the hallway at 11:36 of the video.

[7] The women can be seen walking toward the Nurses Station at 12:01 of the video and the men can be seen outside the Station at 12:38 of the video. Notably, SON Addai later told investigators that she was in the bathroom when hearing the code around 9 pm and, upon finishing, she responded to the unit where she "sat and talked to [HST] Masaquoi for a few minutes" before proceeding to the Nurses Station.

[8] She can be seen walking down the hallway at 16:30 of the video.

86.     At no point in time did Dr. Edokwe (or any other THP responders), *inter alia*, stabilize Hoagland's head/neck, turn him sideways to free his airway, or provide him with supplemental oxygenation.

87.     Around 9:25 pm, EMS arrived, at which time Dr. Edokwe left the scene.[9]

88.     Upon information and belief, ADON Kaplan and ADON Anigbogu arrived shortly thereafter, approximately twenty minutes after first being notified of the medical emergency.

89.     Around 9:30 pm, EMS wheeled a stretcher into the Nurses Station and, sometime thereafter, transported Hoagland to Capital Health Regional Medical Center, where he arrived around 10 pm.

90.     Hoagland was admitted to the hospital as a high level trauma, spending the first two weeks intubated and comatose, requiring a feeding tube and other critical care for a month thereafter.   He was not discharged until July 22, 2021, having been diagnosed with a severe traumatic brain injury ("TBI"), acute respiratory failure, encephalopathy, and facial lacerations.

91.     Upon reentry to TPH, Hoagland required around the clock assistance with activities of daily living, assorted therapies, and fall and choking precautions.   He was non-ambulatory and required a soft diet for many months.

---

[9] Upon information and belief, Dr. Edokwe later falsified his records to, *inter alia*, erroneously reflect that he immediately responded to Hoagland's medical emergency (i.e. writing 9:25 pm for his evaluation of Hoagland and 9:30 pm for his evaluation of HA, with a cut on his palm).   Not only are Dr. Edokwe's signed incident reports belied by the surveillance video showing his whereabouts (according to the DOH Report), but he shockingly told DOH investigators several months later that he initially thought the medical emergency was called for HST Masaquoi who was in the lounge and then HA who was in another room off of the East-West corridor, before learning of Hoagland's major injury in the Nurses Station.

92.    To this day, Hoagland remains at TPH – legally incapacitated, non-ambulatory, incontinent, pained, forgetful, and confused, with impaired speech and no use of his dominant right hand – as he awaits acceptance to an appropriate residential health care and/or TBI facility.

93.    Upon information and belief, some Defendants were disciplined and/or terminated from TPH after the incident, and some but not all still work at TPH.   For example, according to the DOH Report, Dr. Edokwe was suspended with pay for two days due to the incident, before returning to work.

94.    According to the DOH Report, allegations of neglect against many of the Defendants named herein were found to be substantiated.[10]  The Report stated:

> *Based on the preponderance of evidence, the allegation that Mr. Milan Hoagland, an individual receiving services from the Department of Health (DOH) Division of Behavioral Health Services (DBHS), at Trenton Psychiatric Hospital (TPH) was neglected by TPH staff member, Ms. Love Aboagye, Charge Nurse (CN), Mr. Loveday Anyanwu, Human Services Technician (HST), Ms. Sheila Christophe, HST, Ms. Tanysha Fryar, Human Services Assistant (HSA), Mr. Zachary Walton, Charge Nurse (CN), Ms. Abiola Badejo, Supervisor of Nursing (SON), Ms. Inesia Bastien, HST, Mr. Demetrius Mose, HST, Ms. Veronica Arkuwollie, HST, Ms. Martine Domond, HST, and Ms. Carmena Jeannot, HAS, causing major injury is substantiated.*

95.    With respect to HST Arkuwollie and HSA Domond, the DOH found that their excuses for not responding to the emergency code (i.e. they were unable to respond due to their assignments at the time and were unaware of others responding) were inconsistent with surveillance video showing them entering the West stairwell at 9:03 pm.

---

[10] As stated in the Report, pursuant to Administrative Order (A.O) 2:05, neglect defined as "the failure of a caregiver (person responsible for the individual's welfare) to provide the needed services and supports to ensure the health, safety, and welfare of the individual."

96.     Similarly, with respect to HSA Jeannot, the DOH found that her excuse for not responding to the emergency code (i.e. she remained on the East-2 unit because most others on the unit were already responding) was inconsistent with surveillance video showing her entering the East-West hallway and walking toward the West-2 main entrance, but not entering it, at 9:03 pm.

## PATTERN AND PRACTICE OF CONSTITUTIONALLY DEPRIVING PATIENTS WITH SERIOUS MENTAL ILLNESS

97.     Long before Defendants mismanaged Hoagland's medical condition and allowed him to provoke an altercation only to then fall prey to a savage beating under their care and custody, TPH's failures to appropriately treat and protect patients like Hoagland were longstanding, rampant, and well-known.

98.     A decade earlier, the New Jersey Herald published an August 2011 article from a mental health advocate titled "*State closing down wrong mental hospital*", stating that TPH was a poorly run hospital which should have been closed and was in jeopardy of losing its accreditation following a recent audit.

99.     Two years later, NBC10 published an article titled "*Workers at Trenton Psych Hospital Say Conditions Are Unsafe*", reporting on an employee protest due to unsafe working conditions with one employee stating that "residents here run the asylum".

100.    In 2014, NJ.com published articles reporting on a patient-on-patient attack resulting in blindness and a patient-on-staff attack resulting in a broken hand, followed by an article titled "*N.J. advocates concerned about safety in state's psychiatric hospitals*" (referencing the aforementioned attacks.

21

101.    In 2016, the Association of Health Care Journalists issued a report regarding deficiencies at TPH compiled by health inspectors for the federal government.    Based upon observation, staff interviews, and review of policy and procedures, the inspectors found that the facility "failed to ensure the overall hospital environment was maintained for the safety and well-being of the patients, staff, and public."

102.    In 2018, articles were published following an Executive Assessment (described below) titled "*Report paints bleak picture of conditions at NJ's psychiatric hospitals*" and "*How can the state reform its long-neglected psychiatric hospitals?*".    The articles refer to the Assessment as having "painted a devastating picture of conditions at the hospitals" and the government's recognition that the hospitals were underfunded and understaffed.

103.    On August 21, 2018, an outside consultant called New Solutions, Inc. authored a comprehensive Assessment called *Organizational Review & Assessment at State Psychiatric Hospitals*.    Notably, the Assessment found an array of deficiencies at New Jersey's four psychiatric hospitals (one of which is TPH), including, *inter alia*:

- Insufficient workflows and quality of care issues

- Staffing plans which required a "complete and extensive overhaul"

- Staff fear, lack of empowerment, complacency, and low morale

- Disorganized management and supervisory training

- Underutilization of certain psychiatric medications

- Training, treatment, psychopharmacology issues leading to decreased safety

- Unstable unit nursing staffing

- Inconsistent security measures

22

104.     Notably, the Assessment recommended:

> Address the issue of patient and staff safety to mediate concerns over violence with a multifaceted approach based on best practices implementation; ongoing staff education regarding de-escalation techniques; enhanced direct patient care involvement with psychiatrists, clinical and nursing staff; strategies to deal with staff burnout and fear; census reduction via greater availability of community resources and diversionary beds; and prudent and selective use of containment strategies.

105.     Following the Assessment, the DOH purportedly embarked on an 18-month action plan which included refresher training in responding to medical emergencies.[11]

106.     On November 9, 2020, NJ.com published an article titled "*N.J.'s most troubled psychiatric hospital gets federal oversight after patient deaths, dangerous conditions*". Although the article discussed a 2018 class action lawsuit filed by the Public Defender's Office against NJ officials alleging daily constitutional violations at Greystone Park Psychiatric Hospital, both the lawsuit and article shed light on constitutional violations that were not limited to Greystone but rather plagued other hospitals such as TPH.

107.     For example, the lawsuit (2:18-cv-17303) alleged, *inter alia*: (a) an escalating rate of assaults; (b) defendants' inability to protect patients and staff; (c) failure to hire and maintain capable staff; (d) failure of the one-to-one observation system (including director overrides of clinician orders); (e) inadequate medical care to monitor dangerous medications; and (f) failure to provide necessary medical care and security.

---

[11] According to statistics published by the DOH, TPH had the most reported assaults among the four psychiatric hospitals in 2018 and earlier, most of which were patient to patient assaults resulting in moderate to major injuries.

108.    According to the article, at the end of 2020, the New Jersey government reached a settlement agreement (still awaiting approval) committing to, *inter alia*, add more psychiatrists, improve medical and mental health care, ensure appropriately stocked code carts, and report to a new oversight committee for years to come.

109.    Moreover, on November 12, 2021, the Association of Health Care Journalists published another inspection report (similar to that in 2016), in which the TPH inspectors found that the facility "failed to ensure that patients had the right to receive care in a safe setting" and "failed to implement their policy and procedure for the safe and accurate administration of medication".

110.    Problems at TPH persist to this day.    Just a couple of weeks ago, NJ.com published an article titled "*A state hospital ignored a mother's pleas for answers.    A N.J. leader calls it 'disgraceful'*".    The article reported on TPH's "checkered past", including multiple patient attacks in recent years, and DCEO Johnson's thoughts regarding a particular patient's discharge.

111.    The unconstitutional pattern and practice at TPH has been alleged in a litany of lawsuits against the facility, as well as administrators such as CEO Caporoso, DCEO Hollen, DCEO Johnson, and Dr. Ahmad.

112.    For example, the following notable TPH related lawsuits were filed in this Court in the years preceding the Hoagland incident:

- *Brandt v. Feibusch* (Civ. No. 10-4223) – alleging constitutional violations at TPH stemming from conflicts on the Raycroft unit

- *Fladger v. Trenton Psychiatric E.2 Treatment Team* (Civ. No. 12-5982) – alleging a failure to prevent another patient's attack

24

- *Tyler v. Cruz* (Civ. No. 15-2951) – same

- *Dotson v. Trenton Psychiatric Hospital's Staff* (Civ. No. 16-5233) – alleging deliberate indifference to medical needs for lack of attention after a beating

113.    Indeed, similar civil rights lawsuits have been filed against other New Jersey psychiatric hospitals, including but not limited to *Ali v. Ann Klein Forensic Ctr.* (Civ No. 21-00316); *Williams v. Ann Klein Forensic Ctr.* (Civ. No. 18-9606); and *Doe v. Ann Klein Forensic Ctr.* (Civ. No. 19-7610).

114.    Moreover, the unconstitutional, wanton, reckless and neglectful ways of the supervisory Defendants in this case have been brought to light in several employment-based lawsuits:

- *Giantini v. State of New Jersey* (Middlesex County, MID-L-004893-18) – former TPH psychologist filed lawsuit against CEO Caporoso and others alleging understaffing, undertraining, and unreasonably dangerous units

- *Rizvi v. Ahmad* (Mercer County, MER-L-001911-22) – longtime TPH psychologist filed lawsuit against Dr. Ahmad, DCEO Hollen, DCEO Johnson, TPH, and others alleging, *inter alia*, poor staffing, "horrific and perilous conditions", and Dr. Ahmad's persistent practice since being hired in 2018 of prescribing inappropriate medications and discontinuing "one-on-ones", practices countenanced by the DCEOs which "endangered the lives of staff and patients" including Hoagland[12]

- *Faraci v. New York State Office of Mental Health* (New York County, 159085/2012) – psychiatrist at New York psychiatric facility where Dr. Ahmad served as director before TPH filed lawsuit against Dr. Ahmad and others alleging that he fostered a hostile work environment and retaliated for her complaints about poor staffing and other issues

---

[12] Though not named as a defendant in the Rizvi lawsuit, upon information and belief, Coordinator Loesch knew about and was complicit with such practices, at least as it concerns the Raycroft unit where the Hoagland incident occurred.

115.    These and other lawsuits, in addition to the numerous articles and assessments summarized above, squarely put Defendants on notice of an unconstitutional pattern and practice that needed to be rectified **before** the Hoagland incident of two years ago.

116.    Egregious and rampant failures on Defendants' collective part led to Hoagland's catastrophic, permanent, but wholly foreseeable and avoidable injuries for which Plaintiff seeks recovery on his behalf.

**COUNT I - VIOLATION OF CIVIL RIGHTS (FOURTEENTH AMENDMENT) PLAINTIFF v. DEFENDANTS ROBYN WRAMAGE-CAPOROSO, JAMES HOLLEN, FAITH JOHNSON. TIMOTHY LOESCH, INTIKHAB AHMAD, FAIZA ZUBAIR, METTY CLARK, MEDICAL PROVIDERS JOHN/JANE DOES (1-10), AND SUPERVISORY OFFICALS JOHN/JANE DOES (1-10)**

117.    Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

118.    At all relevant times, Defendants, acting under color of law, were deliberately indifferent to Hoagland's serious medical needs and substantially departed from accepted professional judgment, practice, or standards.

119.    In particular, Defendants utterly failed in at least the following respects:

a.  timely and accurately recognize, diagnose, and treat Hoagland's medical condition;

b.  make adequate physical and mental examinations;

c.  prescribe appropriate medications;

d.  change the medication regimen when the prescriptions were not having the intended effect;

e.  follow the medication plan that was implemented;

f.  order and maintain an appropriate observation status such as 1:1 or even 2:1 in certain circumstances;

26

g.  treat Hoagland aggressively rather than absurdly relying on his "coping skills";

h.  implement a clear intervention plan; alter the plan of care when Hoagland's behavior and condition did not improve and in fact deteriorated;

i.  house Hoagland in the appropriate unit as far away as possible from certain patients, such as HA, with whom he clearly could not get along;

j.  consider a transfer back to the Ann Klein Forensic Center or a more restricted unit at TPH given his uncontrollable and excessively threatening words and actions;

k.  rely upon the plan set forth by clinicians who had direct responsibility for his care;

l.  promptly and properly communicate with other medical providers and administrators;

m.  render proper and timely treatment and care to Hoagland, including on an emergency/stat basis as required under the circumstances; and

n.  ensure that Hoagland was cared for and protected by a well-trained staff, competent to quell dangerous situations before they boiled out of hand, activate and respond to emergency codes, employ physical restraints, and provide emergent medical care including basic life support with proper usage of crash carts should predictable events unfold as they did on May 4, 2021.

120.    For minutes, hours, days, weeks, months, and even years, Defendants possessed actual knowledge of Hoagland's serious mental illnesses, history of threats and assaults, both involving staff and fellow patients, and uncontrollable behavior (including on the very day and shift of the incident).

121.    Despite such knowledge, Defendants ignored, if not exacerbated, Hoagland's obvious violent propensities and failed to take necessary and available precautions which would have saved him from the life-threatening injuries he suffered, such as housing him in the appropriate unit; providing the appropriate diagnoses and treatments, including medications,

counseling, and trained medical and mental health professionals; ensuring that he was observed at all times or at least at regular intervals; and ordering interventions the moment the need arose.

122.    Defendants' failure to treat, monitor, and address Hoagland's legitimate and serious medical needs transcended contemporary standards of decency, are shocking to the conscience of mankind, and violated his Fourteenth Amendment right to adequate medical care at all times during his involuntary commitment, and the concomitant right to be free from state-created danger.

123.    Defendants' unreasonable, egregious, malicious, willful, and intentional acts and omissions constitute a deliberate indifference and callous disregard for Hoagland's life, safety, and well-being, and represented a substantial departure from accepted professional judgment, practice, or standards.

124.    As a direct and proximate result of the foregoing, Hoagland has suffered and will continue to suffer from severe physical and mental pain and suffering, disfigurement, embarrassment, humiliation, loss of enjoyment of life's pleasures, and lost earning capacity, and has been forced to incur ongoing expenses to address the aforementioned injuries.

125.    As a direct and proximate result of Defendants' unlawful and unconstitutional behavior, Hoagland suffered catastrophic and permanent bodily harm, including a severe traumatic brain injury, which will require a lifetime of medical expenses to care for.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for compensatory and punitive damages in an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such other relief as the Court deems just and proper.

**COUNT II – MEDICAL NEGLIGENCE (STATE LAW)**
**PLAINTIFF v. DEFENDANTS ROBYN WRAMAGE-CAPOROSO, JAMES HOLLEN,**
**FAITH JOHNSON, TIMOTHY LOESCH, INTIKHAB AHMAD, FAIZA ZUBAIR, METTY**
**CLARK, MEDICAL PROVIDERS JOHN/JANE DOES (1-10), AND SUPERVISORY**
**OFFICALS JOHN/JANE DOES (1-10)**

126.     Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

127.     At all relevant times, Defendants had a duty to comply with generally accepted medical and mental health standards of care in their medical treatment of Hoagland.

128.     Defendants violated their duty of care to Hoagland and were careless, negligent, and reckless in all respects set forth in Count I above.

129.     Defendants' violation of their duty of care, in reckless and wanton disregard for Hoagland's safety and well-being, increased the risk of harm to Hoagland and was a direct and proximate cause and substantial factor in bringing about his serious bodily injuries.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for compensatory and punitive damages in an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such other relief as the Court deems just and proper.

**COUNT III - VIOLATION OF CIVIL RIGHTS (FOURTEENTH AMENDMENT)**
**PLAINTIFF v. DEFENDANTS EDITH MASAQUOI, LOVEDAY ANYANWU, LOVE**
**ABOAGYE, SHEILA CHRISTOPHE, TANYSHA FRYAR, INESIA BASTIEN, ZACHARY**
**WALTON, ABIOLA BADEJO, DEMETRIUS MOSE, JUNIOR APPOLON, VERONICA**
**ARKUWOLLIE, MARTINE DOMOND, CARMENA JENNOT, KALU UGURU,**
**LAURETTA KETTER, NGOZI OCHIORA, VIDA ADDAI, KESHIA SMITH, TAKAY,**
**FOKA, JUAN BERMUDEZ, MARCIA KAPLAN, MILLICENT ANIGBOGU, OBUNIKE**
**EDOKWE, MEDICAL PROVIDERS JOHN/JANE DOES (1-10), and EMERGENCY**
**RESPONDERS JOHN/JANE DOES (1-10)**

130.     Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

131.    At all relevant times, Defendants, acting under color of law, were deliberately indifferent to Hoagland's serious medical needs and substantially departed from accepted professional judgment, practice, or standards.

132.    Hoagland had a fundamental right to be secure in his person and not be physically and emotionally brutalized, either by staff or other patients.

133.    Defendants had a duty, opportunity, and means to intervene when Hoagland became an obvious danger to himself and others.

134.    Defendants had a duty, opportunity, and means to intervene when Hoagland started acting destructively and violently toward staff.

135.    Defendants had a duty, opportunity, and means to intervene when Hoagland was being viciously attacked by a gang of patients, and even before that.

136.    Defendants had a duty, opportunity, and means to intervene when patient HA was bashing him over the head with a foreign object, and even before that.

137.    Moreover, in the aftermath of the savage beating Hoagland visibly endured at the hands and feet of four other patients, Hoagland's desperate need for urgent medical attention was so obvious that even a lay person would have recognized it.

138.    Defendants had a duty, opportunity, and means to provide immediate medical care to Hoagland, both before and after HA repeatedly bashed him over the head with the water cooler.

139.    Rather than satisfying their obvious duty to emergently respond, Defendants shockingly chose to stand idle and provide Hoagland with virtually no medical care for an inordinate amount of time.

30

140. In particular, Defendants utterly failed to act in at least the following respects:

    a. timely and properly report Hoagland's threatening behavior to the appropriate authorities when evident at the start of the shift;

    b. timely and properly ensure that Hoagland received the medical care and other attention he deserved and required;

    c. timely and appropriately react when Hoagland started destroying property and throwing trash;

    d. keep the door to the Nurses Station closed so that Hoagland could not enter to attack staff and destroy property;

    e. open the door to the Medication Room so that HST Masaquoi could be out of harm's way, as was HST Anyanwu;

    f. timely and properly activate the psychiatric emergency code;

    g. timely and properly respond to the psychiatric emergency code;

    h. timely and properly treat and tend to other patients who came on the scene;

    i. restrict the other patients' access to the Nurses Station by keeping the door shut;

    j. instruct the other patients not to enter the Nurses Station;

    k. timely and properly utilize physical and/or chemical restraints;

    l. timely and properly enter the Nurses Station to intervene when the other patients began savagely beating Hoagland;

    m. timely and properly activate the medical emergency code;

    n. timely and properly respond to the medical emergency code;

    o. escort the other patients out of the Nurses Station after the beating stopped;

    p. timely and properly restrain HA when he refused any verbal orders to leave the Nurses Station;

q.  immediately re-open the door to the Nurses Station to gain access after HA closed the door;

r.  timely and properly intervene before HA resumed his aggravated assault with use of the water cooler;

s.  timely and properly intervene once HA began bashing Hoagland with the water cooler;

t.  immediately enter the Nurses Station once the violence had ended to tend to Hoagland's desperate medical needs;

u.  render proper and timely emergent and life support treatment to Hoagland including but not limited to checking his vitals, taking his blood pressure, securing his head and neck, turning him on his side to free his airway, providing supplemental oxygen, administering medication, and using medical equipment available via crash cart or otherwise;

v.  timely and properly communicate with other emergency responders and medical providers; and

w.  ensure that Tactical EMS was prepared to provide emergent care on an emergent basis.

141.    Defendants' acts and omissions foreseeably and shockingly created a powder keg ready to explode, exacerbated a volatile situation, and created an unnecessary danger.

142.    Defendants' collective failure to intervene, respond, and provide medical care transcended contemporary standards of decency, are shocking to the conscience of mankind, and violated Hoagland's Fourteenth Amendment right to adequate medical care at all times during his involuntary commitment, and the concomitant right to be free from state-created danger.

143.    Defendants' unreasonable, egregious, malicious, willful, and intentional acts and omissions constitute a deliberate indifference and callous disregard for Hoagland's life, safety, and well-being, and represented a substantial departure from accepted professional judgment, practice, or standards.

144.     As a direct and proximate result of the foregoing, Hoagland has suffered and will continue to suffer from severe physical and mental pain and suffering, disfigurement, embarrassment, humiliation, loss of enjoyment of life's pleasures, and lost earning capacity, and has been forced to incur ongoing expenses to address the aforementioned injuries.

145.     As a direct and proximate result of Defendants' unlawful and unconstitutional behavior, Hoagland suffered catastrophic and permanent bodily harm, including a severe traumatic brain injury, which will require a lifetime of medical expenses to care for.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for compensatory and punitive damages in an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such other relief as the Court deems just and proper.

**COUNT IV - MEDICAL NEGLIGENCE (STATE LAW)**
**PLAINTIFF v. DEFENDANTS EDITH MASAQUOI, LOVEDAY ANYANWU, LOVE ABOAGYE, SHEILA CHRISTOPHE, TANYSHA FRYAR, INESIA BASTIEN, ZACHARY WALTON, ABIOLA BADEJO, DEMETRIUS MOSE, JUNIOR APPOLON, VERONICA ARKUWOLLIE, MARTINE DOMOND, CARMENA JENNOT, KALU UGURU, LAURETTA KETTER, NGOZI OCHIORA, VIDA ADDAI, KESHIA SMITH, TAKAY, FOKA, JUAN BERMUDEZ, MARCIA KAPLAN, MILLICENT ANIGBOGU, OBUNIKE EDOKWE, MEDICAL PROVIDERS JOHN/JANE DOES (1-10), and EMERGENCY RESPONDERS JOHN/JANE DOES (1-10)**

146.     Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

147.     At all relevant times, Defendants had a duty to comply with generally accepted medical and mental health standards of care in their medical treatment of Hoagland.

148.     At a minimum, Defendants were duty bound to follow TPH's Psychiatric Emergency Policy and Medical Emergency Policy, but they all breached such duties.

149.    Defendants violated their duty of care to Hoagland and were careless, negligent, and reckless in all respects set forth in Count III above.

150.    Defendants' violation of their duty of care, in reckless and wanton disregard for Hoagland's safety and well-being, increased the risk of harm to Hoagland and was a direct and proximate cause and substantial factor in bringing about his serious bodily injuries.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for compensatory and punitive damages in an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such other relief as the Court deems just and proper.

### COUNT V  VIOLATION OF CIVIL RIGHTS (*MONELL* CLAIMS) PLAINTIFF  v. DEFENDANTS ROBYN WRAMAGE-CAPOROSO, JAMES HOLLEN, FAITH JOHNSON. TIMOTHY LOESCH, INTIKHAB AHMAD, AND SUPERVISORY OFFICALS JOHN/JANE DOES (1-10)

151.    Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

152.    The violations of Hoagland's constitutional rights as set forth above were directly and proximately caused by the deliberate indifference of the Supervisory Defendants (named in the heading to this Count) to the need for hiring, training, supervision, investigation, monitoring, and/or discipline with respect to security interventions and the provision of specialized medical care to involuntarily committed mental health patients such as Hoagland, under their custody and control.

153.    The violations of Hoagland's constitutional rights as set forth above were directly and proximately caused by the encouragement, tolerance, ratification of, and deliberate indifference of the Supervisory Defendants to the policies and practices of their own as well as

their agents and employees of refusing, delaying, interfering with, or negligently providing timely and appropriate medical care and treatment to those in special need like Hoagland.

154.    The violations of Hoagland's constitutional rights as set forth above were directly and proximately caused by the abject failure of the Supervisory Defendants, with deliberate indifference, to develop, implement, update, and/or enforce policies and practices to ensure that patients like Hoagland received timely, necessary, and appropriate medical care for serious mental illness and critical life saving measures, and that they were not subject to savage beatings.

155.    On and well before May 4, 2021, the Supervisory Defendants knew or certainly should have known of the need to improve and correct failed hiring, training, supervision, investigation, monitoring, discipline, policies, and practices by virtue of, *inter alia*, a laundry list of other lawsuits, published articles, and comprehensive assessments, alleged above.

156.    The above referenced failures proximately caused Hoagland's serious bodily injuries in that they directly and in natural and continuous sequence produced, contributed substantially, or enhanced such injuries.

157.    The aforementioned acts and/or omissions constitute willful and wanton misconduct in disregard of the rights, health, well-being, and safety of Hoagland to his great and permanent detriment.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for compensatory and punitive damages in an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such other relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

In accordance with the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury as to all counts and issues raised herein.

**EISENBERG, ROTHWEILER,**
**WINKLER, EISENBERG & JECK, P.C.**

**BY:** ___*s/Todd A. Schoenhaus*_____
**NANCY J. WINKLER, ESQUIRE**
**TODD A. SCHOENHAUS, ESQUIRE**
**1634 Spruce Street**
**Philadelphia, PA   19103**
**Attorneys for Plaintiff**

Date: May 3, 2023